# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

JIMMIE W. DAVIS, individually,
and as TRUSTEE of the JIMMIE W. DAVIS
REVOCABLE TRUST,

     Plaintiff,

v.                                                                    No. 10-CV-883 KG/WPL

ST. ANSELM EXPLORATION CO.,
a Colorado corporation, ANNA M.R.
WELLS, and MARK PALMER,

     Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is a breach of contract action dealing with investment securities sold in the form of promissory notes ("Notes") issued by Defendant St. Anselm Exploration Company ("St. Anselm") and purchased by Plaintiff Jimmie W. Davis, individually and as trustee of the Jimmie W. Davis Revocable Trust ("Davis"). The Court held a bench trial on October 7-8, 2014, on the question of whether Plaintiff was an accredited investor during the relevant time period. Thereafter, each party submitted Proposed Findings of Fact and Conclusions of Law. The Court has Plaintiff's Proposed Findings of Fact and Conclusions of Law, filed September 22, 2014, (Doc. 210), Defendants' Proposed Findings of Fact and Conclusions of Law, filed September 22, 2014, (Doc. 207), Plaintiff's Second Proposed Findings of Fact and Conclusions of Law, filed February 3, 2015, (Doc. 236), and Defendants' Second Proposed Findings of Fact and Conclusions of Law, filed February 3, 2015, (Doc. 235). Having considered all of the evidence presented in this matter, the filings, and applicable law, the Court makes the following Findings of Fact and Conclusions of Law:

**FINDINGS OF FACT**

1.   St. Anselm is a privately-held Denver-based corporation.  The company conducts oil, gas, and geothermal exploration and development.  (Doc. 225) at 244.

2.   Davis resides in New Mexico.

3.   St. Anselm historically raised funds for its operations through Note offerings.  The Notes typically carried high interest rates.  (Doc. 226) at 83.  In some instances, these Notes have paid interest rates upwards of thirty percent.

4.   St. Anselm issued a Note to Davis on October 1, 2008, for $120,000 (Ex. M) and another on October 3, 2008, for $130,000 (Ex. E).  The terms of the Notes include that interest was to "accrue at the rate of twenty percent (20%) per annum and shall be paid monthly, commencing on November 1, 2008, and on the first (1st) day of the month thereafter until this Note is paid in full."  (Ex. E) at 1; (Ex. M) at 1.

5.   St. Anselm offered an interest bonus of 5% if Davis agreed to roll over the funds from the two 2008 Notes.  (Doc. 199) at 9; (Exs. 4, 12.)

6.   Davis agreed, and rolled over the funds from the 2008 Notes into an October 1, 2009, Note and an October 3, 2009, Note.  (Doc. 199) at 10; (Exs. C, K.)

7.   As a result, St. Anselm issued a new $120,000 Note on October 1, 2009, (Ex. I), and a new $130,000 Note on October 3, 2009 (Ex. A).

8.   The Notes issued to Davis were offered by St. Anselm pursuant to a Securities and Exchange Commission ("SEC") reporting exemption known as Regulation D, 17 C.F.R. §

230.506.  (Doc. 226) at 92.  By adhering to Regulation D guidelines, St. Anselm was exempted from the registration requirements of section 5 of the Securities Act of 1933.[1]  (*Id.*)

9.   The exemption provided by Regulation D permitted the sale of Notes to up to thirty-five unaccredited investors.   Nevertheless, St. Anselm chose to sell only to accredited investors. (Doc. 226) at 93-94.   St. Anselm relied on investors' sworn self-certifications in their Subscription Agreements to determine whether investors were accredited.  (Doc. 87) Ex. 1 at 7.

10. In order to purchase the Notes, Davis submitted two Subscription Booklets, each of which contained a Purchaser Questionnaire and Subscription Agreement.   One Subscription Booklet was for a $130,000 Note (Ex. H), and the second Subscription Booklet (collectively, the "Offering Documents") was for a $120,000 Note (Ex. P).

11. The full name of the Subscriber in the Offering Documents is the Jimmie W. Davis Revocable Trust, and the Subscriber is identified as a "trust."  (Ex. H) at 2; (Ex. P) at 2.

12. The Offering Documents ask, in bold type directly above Davis's signature as Subscriber, whether the Subscriber is an accredited investor and, if so, how the Subscriber qualifies as an accredited investor.  (Ex. H) at 7; (Ex. P) at 7.  Davis certified that he was an accredited investor by virtue of his "net worth."  (Ex. H) at 7; (Ex. P) at 7.

13. The Offering Documents provide a list of what circumstances make an investor "accredited."  (Ex. H) at 5-6; (Ex. P) at 5-6.  The only reference to "net worth" in the Offering Documents provides as follows:

> A natural person whose net worth, individually or jointly with spouse, exceeds $1,000,000 at the time of the investment (including the value of that person's

---

[1] "Under Section 5 of the Securities Act, all issuers must register non-exempt securities with the Securities and Exchange Commission (SEC). Section 5 regulates the timeline and distribution process for issuers who offer securities for sale." *Securities Act of 1933*, CORNELL UNIVERSITY LAW SCHOOL LEGAL INFORMATION INSTITUTE (Sept. 29, 2015, 4:34 PM), https://www.law.cornell.edu/wex/securities_act_of_1933.

principal residence valued at either (x) cost, including cost of improvements, net of current encumbrances on the property, or (y) the appraised value of the property as determined by a written appraisal used by an institutional lender making a loan to that person secured by the property, including subsequent improvements, net of current encumbrances on the property).

(Ex. H) at 6; (Ex. P) at 6.

14. Davis affirmed by signature in the Offering Documents that he "represents and warrants to the company as follows: (iii) The Subscriber is an 'accredited investor,' and in addition, has sufficient experience in financial matters and prior investments to evaluate the potential benefits, and the risks, of investing in the company." (Ex. H) at 8; (Ex. P) at 8.

15. St. Anselm accepted Davis's representations in 2008 and 2009 that he was an accredited investor. (Doc. 226) at 182.

16. Defendants Anna M.R. Wells, St. Anselm's President, and Mark S. Palmer, St. Anselm's Vice-President, personally guaranteed, jointly and severally, payment of the Notes together with interest and the reasonable costs of collection, including attorney fees. (Doc. 199) at 10.

17. In August 2010 and September 2010, however, St. Anselm failed to make payments due to Davis and has not made any payments since. (Doc. 199) at 10.

18. On August 16, 2010, and after defaulting on the Notes, St. Anselm offered each of the 198 note holders to restructure its debt. (Doc. 226) at 68. Only two note holders, including Davis, accepted restructuring terms such that existing Notes were rolled over into new, five-year Notes with five percent fixed-rate interest. (*See* Doc. 226) at 13-16.

19. Davis's 2009 Notes state, "If any payment required by this Note is not paid and such failure continues for a period of thirty (30) days after the giving of written notice of such failure by Payee to Maker, this Note shall be considered to be in default and the entire unpaid principal

4

sum hereof shall, at the option of the holder hereof, by notice to Maker, become immediately due and payable in full."  (Ex. A) at 1; (Ex. I) at 1.

20. On or about August 17, 2010, Davis demanded payment in full on the Notes, stating:

> Due to the failure to make the August 4th or the August 16th payment as per your contract you are now in default. This is a demand for payment in full on promissory notes dated October 1, 2009, and October 3, 2009, in the amount of $250,000.00, plus unpaid interest.

(Doc. 199) at 10; *see* (Doc. 226) at 134.

21. St. Anselm did not pay Davis.  As a result, Davis filed this lawsuit on September 22, 2010.  (Doc. 1.)

22. In order to show that he was an accredited investor at the time he purchased the Notes in 2008 and 2009, Davis claimed to own, among other property, approximately twenty real properties in 2008, including some properties with mobile homes and others that were vacant land.  (Doc. 225) at 73.

23. Davis's primary residence was four thousand square feet, located on over five acres, and included horse stables and six mobile homes at the "back" of the property.  (*Id.*) at 120, 123.

24. Davis co-owned two commercial rental apartments on Montano Road in Albuquerque, New Mexico.  (*Id.*) at 128, 174, 177, 197, 201.

25. Davis owned eight other houses or apartment complexes in 2008 and 2009.  (*Id.*) at 134, 136-40.  One of the homes was twelve hundred square feet.  (*Id.*) at 138.

26. Davis sold an investment with PFG Best sometime after the issuance of the Notes.  (*Id.*) at 160-61.

27. In 2008 and 2009, Davis's assets included a garage, carport, workshop, horse barn, gold, silver, art, pictures, Kachina, Hopi carvings, pottery, blankets, gun collection, wildlife trophies,

Indian jewelry, stamp collection, five boats, two jet skis, two lawn mowers, and trailers.  (*Id.*) at 189-90, 193-97.

28. At trial, Davis conceded he did not check his bank accounts or evaluate his real estate holdings, gold and silver, commodities, or vehicles in 2008 or 2009 before purchasing the Notes. (*Id.*) at 181-85.  That is, Davis did nothing specific to confirm his net worth.  (*Id.*) at 187.

29. Davis took out a $250,000, ten-year loan on his primary residence, which he paid off about one year prior to trial.  (Doc. 225) at 73.  He believed that the balance on the loan was approximately $140,000 in 2008 and $126,000 in 2009 at the time of the issuance of the Notes. (*Id.*) at 144-45.

30. Davis's niece took a mortgage loan against one of the Montano Road properties for $60,000.  (*Id.*) at 177, 234.

31. Davis listed in this case accounts receivable in the amount of $110,000 in the names of Jess and Ross Bird, who filed for bankruptcy on April 22, 2008.  (*Id.*) at 203, 205, 211.  Davis also listed $86,000 in receivables from VSI, a company which is no longer in business, (*id.*) at 212, and $200,000 from either Christy Valdez or her company, the Reform Spine and Injury Care Center, LLC, (*id.*) at 214.[2]

32. Davis was indicted on October 21, 2008, on a charge of knowingly and willfully making a false, fraudulent, and fictitious material statement to the United States Department of Housing and Urban Development.  (*Id.*) at 171-73.[3]  Davis entered a plea agreement on December 9,

---

[2] It is unclear whether Valdez or her company owed the $200,000, but the Court takes judicial notice that Valdez received a Chapter 7 bankruptcy discharge on August 11, 2014, and her company was in Chapter 11 bankruptcy proceedings at the time of trial.  *In re Valdez*, Ch. 7 Case No. 14-11384-t7, Doc. 14 (D.N.M. Aug. 11, 2014); *In re Reform Spine and Injury Care Center, LLC*, Ch. 11 Case No. 13-11020-j11 (D.N.M. 2013).

[3] *United States v. Davis*, No. 08-cr-02448 JCH, Doc. 2 (D.N.M. Oct. 21, 2008).

2008, pleading guilty to theft of government property in the amount of $312 per month for a total of $5,907.  (*Id.*) at 172-73; (Doc. 57) Ex. I.

33. St. Anselm began to question Davis's accredited investor status after it learned of his indictment and guilty plea.  (Doc. 226) at 123-24.  Defense counsel in the present case brought the information about the indictment and guilty plea to St. Anselm's attention in 2011.  (Doc. 226) at 124.  This information prompted St. Anselm to look into the veracity of Davis's self-certification that he was an accredited investor.  (*Id.*) at 112-13, 123-24.

### PROCEDURAL HISTORY REGARDING DAVIS'S ACCREDITED INVESTOR STATUS

1.  On March 2, 2011, St. Anselm indicated within its Response to Plaintiff's Motion for Judgment on the Pleadings that "[o]n information and belief, the Subscription Agreement may have inaccurately set forth certain qualifications of the Trust.  Specifically, Defendants have called into question whether, during the relevant period, the Trust possessed the minimum assets required to qualify as an accredited investor pursuant to 17 C.F.R. 230.501, *et seq*."  (Doc. 26) at 5.  Further, Defendants asserted, "[b]ecause the Trust's status as an accredited investor is essential to Defendants' Answer and Counterclaims, and because that issue cannot be resolved absent formal discovery, Plaintiff's Motion is premature and should be denied."  (Id.) at 7.

2.  On March 17, 2011, the SEC sued St. Anselm in a separate action in the District of Colorado for securities fraud.  *U.S. S.E.C. v. St. Anselm Exploration Co.*, No. 11-cv-668 REB/MJW, Doc. 1 (D. Colo. Mar. 17, 2011).

3.  On July 8, 2011, United States Magistrate Judge William Lynch converted Davis's Motion for Judgment on the Pleadings in the instant case into a motion for summary judgment. He held it in abeyance to allow the parties to conduct limited discovery on Davis's accredited investor status and on whether St. Anselm issued promissory notes only to accredited investors.

(Doc. 77) at 8, 13, 16-17.  Judge Lynch set a deadline of September 1, 2011, to complete the limited discovery.  (Doc. 81) at 1.

4.   On September 29, 2011, Defendants stated in their Response to Plaintiff's Motion for Summary Judgment that, "[d]uring the investigation of this case, Defendants obtained preliminary evidence that indicated Mr. Davis may have misrepresented in the Subscription Booklets that the Trust was an accredited investor."  (Doc. 98) at 3.

5.   On July 16, 2012, St. Anselm filed its proposed findings of fact in the District of Colorado case, asserting that it only sold Notes to accredited investors.  (Doc. 225) at 52 (citing *U.S. S.E.C. v. St. Anselm Exploration Co.*, No. 11-cv-668 REB/MJW, Doc. 112 at 13 (D. Colo. July 16, 2012) (stating that St. Anselm "issued its promissory notes as restricted securities in private placements under SEC Regulation D, Section 506 (17 C.F.R. § 230.506).  [St. Anselm] issued notes only to persons who were 'accredited investors' as defined in SEC Rule 501(a) [17 C.F.R. § 230.501(a)].")).

6.   On March 28, 2013, the Court in the present case denied Davis's motion for summary judgment.  (Doc. 161) at 8.  The Court determined that genuine issues of material fact existed regarding whether Davis was an accredited investor.  *Id.*

7.   On March 29, 2013, the court in the District of Colorado found that "[a]ll holders of promissory notes made by [St. Anselm] and/or its affiliates also were accredited investors, meaning, most significantly, that those holders were presumed to be sophisticated and aware of the risks inherent to the industry, and thus the risk involved in the investment."  (Doc. 226) at 116-17 (internal quotations omitted) (quoting *U.S. S.E.C. v. St. Anselm Exploration Co.*, No. 11-cv-668 REB/MJW, Doc. 151 at 5-6 (D. Colo. Mar. 29, 2013)).  The court entered judgment in favor of St. Anselm.  (*Id.*) at 113.

**CONCLUSIONS OF LAW**

1.  The Securities Act of 1933 ("Act") regulates public offerings of securities, prohibiting

offers and sales of securities which are not registered with the SEC unless exempted from

registration in accordance with the Act.  *See* (Doc. 161) at 4.  Under SEC Regulation D, 17

C.F.R. §§ 230.501-230.508, the term "accredited investor" refers to a specific category of

individuals or entities that may purchase unregistered securities.  Section 230.501(a) defines the

term "accredited investor" to include the following categories of investors:

> (5) Any natural person whose individual net worth, or joint net worth with that person's
> spouse, at the time of his purchase exceeds $1,000,000;
> …
> (7) Any trust, with total assets in excess of $5,000,000, not formed for the specific
> purpose of acquiring the securities offered, whose purchase is directed by a sophisticated
> person as described in Rule 506(b)(2)(ii); and
>
> (8) Any entity in which all of the equity owners are accredited investors.

2.  Davis provided two SEC No-Action letters interpreting "accredited investors" under

Section 230.501(a).[4]  (Docs. 34 Ex. 3, 34 Ex. 4.)  The SEC stated in the No-Action letters that it

would regard a revocable grantor trust, such as Davis's trust, as an accredited investor if each

grantor was an accredited investor under Section 230.501(a)(5) by virtue of having a net worth

above $1 million.  *Id.*  Although the No-Action letters are not controlling, this Court may

---

[4] The SEC website describes no-action letters as follows:

> An individual or entity who is not certain whether a particular product, service, or
> action would constitute a violation of the federal securities law may request a "no-
> action" letter from the SEC staff. Most no-action letters describe the request,
> analyze the particular facts and circumstances involved, discuss applicable laws
> and rules, and, if the staff grants the request for no action, concludes that the SEC
> staff would not recommend that the Commission take enforcement action against
> the requester based on the facts and representations described in the individual's
> or entity's request.

*No-Action Letters*, U.S. Securities and Exchange Commission,
http://www.sec.gov/answers/noaction.htm.

nevertheless find them persuasive.  *Peck v. Pac. CMA, Inc.*, No. CIV.A. 05-CV-00569WY, 2007 WL 1630703, at *8 (D. Colo. June 1, 2007) (citing *New York City Emps. Ret. Sys. v. S.E.C.*, 45 F.3d 7, 13 (2d Cir. 1995) ("While SEC interpretive or no-action letters do not change substantive law and are not binding on courts, they may be treated as persuasive.").

## I.   Condition Precedent in the Offering Documents

3.   A party that fails to satisfy a condition precedent to a contract relieves the other party's contractual obligations.  *Allstate Ins. Co. v. Orban*, 855 P.2d 9, 12 (Colo. App. 1992) ("[A] failure by [a party] to perform [a] condition [precedent] would relieve [the other party] of [its] obligations [under the policy].") (citing RESTATEMENT (SECOND) OF CONTRACTS § 225 (1981)). Under Colorado law,[5] conditions precedent "will not be given effect unless established by clear and unequivocal language."  *Dinnerware Plus Holdings, Inc. v. Silverthorne Factory Stores, LLC*, 128 P.3d 245, 247 (Colo. App. 2004).  "A stipulation in a contract may be a condition or promise, depending on the intention of the parties.  An intent to create a condition in a contract must appear expressly or by clear implications."  *Charles Ilfeld Co. v. Taylor*, 397 P.2d 748, 750 (1964); *see Dinnerware Plus Holdings, Inc.*, 128 P.3d at 247 (finding condition precedent despite no mention of term "condition precedent").  Where there is doubt as to the intention of

---

[5] "[A] federal court sitting in diversity must apply the substantive law of the state in which it sits, including the forum state's choice-of-law rules."  *Boyd Rosene & Assocs., Inc. v. Kan. Mun. Gas Agency*, 123 F.3d 1351, 1352-53 (10th Cir. 1997) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 495-97 (1941)).  This rule applies even in the presence of a contract provision specifying the choice of law for substantive matters.  *Shearson Lehman Bros. v. M&L Invs.*, 10 F.3d 1510, 1514-15 (10th Cir. 1993).  In this case, the parties agreed through the Notes that the Notes "shall be construed under the laws of Colorado." (Exs. A, E, I, M).  Accordingly, this Court must apply New Mexico law to determine whether Colorado law is controlling. "New Mexico . . . has a strong public policy of freedom of contract that requires enforcement of contracts unless they clearly contravene some law or rule of public morals." *United Wholesale Liquor Co. v. Brown-Forman Distillers Corp.*, 1989-NMSC-030, 775 P.2d 233, 237. This Court finds no law or rule of public morals clearly contravened by the application of Colorado substantive law to this case. Therefore, Colorado substantive law applies.

the parties, Colorado courts favor resolving that doubt by interpreting the provision as a promise, rather than as a condition.  *Charles Ilfeld Co.*, 397 P.2d at 750.  Such an approach is based on a policy of avoiding forfeitures where possible—"[v]iolations of conditions usually cause forfeitures, whereas breach of contract can be compensated by damages."  *Id.*  Colorado courts may consider

> whether the particular stipulation goes to the root of the contract so that a failure to perform it would render the performance of the rest of the agreement by the plaintiff a thing different in substance from what the defendant has agreed to, or whether it merely partially affects it and may be compensated for in damages.

*Id.* at 751.

4.  The Court concludes that there is no doubt as to the intention of the parties that the Offering Documents each plainly, if not expressly, contain a condition precedent.  While the language of the Offering Documents does not expressly include the phrase "condition precedent," the clear implication is such that any other interpretation would render the agreement fundamentally changed.  Indeed, in this instance, Davis could not otherwise enter into the contract and invest in the Notes. The Offering Documents confirm that being an accredited investor is a condition precedent to the issuance of a Note.  The importance of such a designation is emphasized numerous times in the agreements:

> a.  "**NOTE: The following information** [referencing subscriber's general information, financial information, and accredited investor status] **must be given for the Subscriber.**"  (Ex. H) at 2; (Ex. P) at 2 (emphasis in original).
>
> b.  "**Does the Subscriber qualify as an "accredited investor" within any of the above categories?  Mark your answer: Yes (__) No (__) If yes, state which category (subparagraph) of 3 above covers your accredited status and very briefly indicate what that category is (net worth, income, etc)**".   (Ex. H) at 7; (Ex. P) at 7 (emphasis in original).
>
> c.  **Subscriber's Representation and Warranties** The Subscriber represents and warrants to the company as follows: (iii) The Subscriber is an "accredited investor," and in addition, has sufficient experience in financial matters and prior

investments to evaluate the potential benefits, and the risks, of investing in the company.  (Ex. H) at 8; (Ex. P) at 8.

5.   The breadth of St. Anselm's inquiry into a potential subscriber's qualifications as an accredited investor demonstrates the importance of that status to the agreement.  Indeed, the only bolded question in the entire Purchaser Questionnaire goes to whether the potential subscriber is an "accredited investor."  (Ex. H) at 7; (Ex. P) at 7.

6.   The nature of St. Anselm's Note Offering confirms the fundamental importance to St. Anselm of only offering and selling notes to accredited investors.  Under the Act, a company that offers or sells its securities must register the securities with the SEC or comply with an exemption from costly registration requirements.   15 U.S.C. §§ 77e(a), (c).   An issuer of securities can be exempted from these registration requirements under Rule 506, as offerings to accredited investors.  17 C.F.R. § 203.506.

7.   The accredited investor condition "goes to the root of the contract so that a failure to perform it would render the performance of the rest of the agreement by the plaintiff a thing different in substance from what the defendant has agreed to."  *Charles Ilfeld Co.*, 397 P.2d at 751.

8.   Indeed, this Court previously questioned Davis at a motions hearing: "[H]ow is condition precedent not already germane to this case and how [is it that Davis] is surprised because it wasn't spelled out in so many letters as condition precedent?"  (Doc. 215) at 64.  Following the motion hearing, this Court provided in an Order that "[t]he language in the Offering Documents and the arguments made by Defendants in this lawsuit show that a denial of performance of a condition precedent is central to this lawsuit."   (Doc. 214) at 3.   Finally, this Court's Memorandum Opinion and Order on Defendants' Motion for Reconsideration notes that "the

main issue in [Davis's] Motion for Reconsideration is whether Davis has properly proven that the Trust is an accredited investor."  (Doc. 175) at 11.

9.   Accordingly, this Court finds that being an accredited investor was a condition precedent to the effectuation of the Notes.

## II.  Whether Davis Met the Condition Precedent

10. When a party asserts that the other party failed to meet a condition precedent, "the party pleading the performance or occurrence shall establish on the trial the facts showing such performance or occurrence."  C.R.C.P.  9.  That is, "[w]here there is a condition precedent . . . , the burden is on the plaintiff to show the condition was—or would have been—satisfied."  *Pioneer Ctrs. Holding Co. Emp. Stock Ownership Plan & Trust v. Alerus Fin., N.A.*, No. 12-CV-02547-RM-MEH, 2015 WL 2065923, at *5 (D. Colo. May 1, 2015) (unpublished).  Accordingly, in the present case, the burden rests with Davis to prove that he met the condition precedent of qualifying as an accredited investor.

11. This Court previously found the SEC No-Action Letters to be persuasive.  (Doc. 175) at 11; (Doc. 161) at 11.  Simply stated, if Davis could "prove, through . . . admissible evidence he . . . presented to the Court, that his individual net worth in October 2008 and 2009[] exceeded $1 million," then he met the condition precedent.  (Doc. 175) at 11.  Davis failed to meet this burden.  The evidence he adduced at trial is unreliable and insufficient.

12. Davis testified that he sold all of his investments in the stock market in 2008 and that he had $699,425.80 in his portfolio from the sale of these stocks as of September 30, 2008.  (Doc. 225) at 61, 71.  Davis could not recall, however, whether all or part of the $250,000 he invested with St. Anselm came from this $699,425.80 or from other resources.  (Doc. 225) at 71, 73.

Davis testified that he invested some of the money from the sale of his stock in 808 Energy, and he also purchased real estate.  (Doc. 225) at 73.

13. Davis's assets in 2008 and 2009 included the two Notes valued at $120,000 and $130,000, respectively, and a warranty deed for Davis's primary residence.  (Exs. A, E, I, M, 55.)  There was no evidence establishing the value of the residence at the time of Davis's purchase of the Notes.

14. Davis represented that the value of the Montano Road property in 2008 and 2009 was $360,000.  (Doc. 225) at 197.  Davis recalled at trial having paid $27,000 for a house about fifteen years before trial and $48,000 for another house about twenty years before trial.  (Doc. 225) at 139-40.  He testified to making approximately $88,000 on his investment with PFG Best.  (*Id.*) at 160-61.  Davis also made "off-the-top-of-his-head" calculations for his garage, carport, workshop, horse barn, gold, silver, art, pictures, Kachina, Hopi carvings, pottery, blankets, gun collection, wildlife trophies, Indian jewelry, and stamp collection.  (Doc. 225) at 189-90, 193-94. Davis used the amounts he paid for his boats, jet skis, lawn mowers, and trailers for their values in 2008 and 2009.  (*Id.*) at 194-97.  He valued his mobile home park at $300,000.  (*Id.*) at 191. Davis provided no independent verification of this figure, however.

15. The testimony that Davis provided about his valuation of various assets is insufficient, inadequate, and fundamentally unreliable.  Davis's "off-the-top-of-his-head" calculations are unsupported.  Davis's testimony, standing alone, of the purchase price from as many as twenty years ago is insufficient and unreliable to establish valuation in 2008.  Davis's valuations are not

based on reliable estimates or appraisals, substantiated documentation, or admissible expert opinion. Furthermore, Davis's valuations of his real property are inadmissible.[6]

16. The only reliable evidence Davis presented at trial of his net worth at the time of his purchases of the Notes in 2008 and 2009 were the $120,000 and $130,000 used to acquire the Notes.  To the very limited extent the evidence as to the value of his estates is reliable at all, the amount of his total liabilities is not.   The evidence of both assets and liabilities together is insufficient to conclude Plaintiff's net worth was at least $1,000,000 in 2008 and 2009.  Davis has failed to meet his burden of demonstrating that he possessed a net worth in excess of $1,000,000 at the time he purchased the Notes. Accordingly, Davis did not satisfy the condition precedent to the contract that he was an accredited investor at the time he purchased the Notes in 2008 and 2009.

**III. Whether Defendants Waived the Condition Precedent**

17. Federal courts sitting in diversity have ruled that waiver of a condition precedent is a matter of state law.  *See Inola Mach. & Fabricating Co. v. Farmers New World Life Ins. Co.*, 631 F.2d 712, 715 (10th Cir. 1980) (applying state law to condition precedent issue when federal court was sitting in diversity); *see also Ferguson v. Upper Chesapeake Med. Servs.*, 91 F.3d 130 (4th Cir. 1996) (same).

18. In Colorado, "[t]o prevail under a theory of waiver, [one party] must show that the [opposing party] expressly or by clear implication relinquished a known right."  *Richmond v. Grabowski*, 781 P.2d 192, 194 (Colo. App. 1989) (citing *Duran v. Housing Auth.*, 761 P.2d 180 (Colo. 1988)).  "For waiver to be implied by conduct, the conduct should be free from ambiguity

---

[6] This Court found Davis's "reliance on his previous professional experience as a real estate investor places his testimony into the category of expert opinion."  (Doc. 175) at 13.  However, this Court also found that because Davis had not complied with the expert disclosure requirements, his valuations of real estate holdings were inadmissible.  (*Id.*) at 14.

and clearly manifest the intention not to assert the benefit."   *Id.* at 195 (citation omitted). Colorado courts have specifically acknowledged that a condition precedent can be waived. *Kaiser v. Mkt. Square Disc. Liquors, Inc.*, 992 P.2d 636, 641 (Colo. App. 1999) ("However, the failure to satisfy . . . a condition [precedent] may, as with any other express contract term, be waived by words or unequivocal acts.").

19. Waiver is an affirmative defense, and the burden is on the party seeking to demonstrate the waiver.  *See Wycoff v. Grace Cmty. Church of the Assemblies of God*, 251 P.3d 1260, 1277 (Colo. Ct. App. 2010) ("Because waiver is an affirmative defense, the defendant has the burden to prove waiver.").   Therefore, the burden is on Davis to show Defendants' waiver of the condition precedent.

20.  The Colorado Jury Instructions provide the following elements for determining whether waiver is applicable: "1) The [defendants] knew that the [plaintiff] had not performed his contractual promise; 2) The [defendants] knew that failure of the [plaintiff] to perform this contractual promise gave [them] the right to [seek a remedy]; 3) The [defendants] intended to give up this right; and 4) The [defendants] voluntarily gave up this right."  Colo. Jury Instr., Civil 30:25.

21. The Court concludes that Davis has provided no evidence that St. Anselm knew Davis might not be an accredited investor at the time the Notes were issued to him in 2008 and 2009.

22. Moreover, knowledge cannot be imputed to St. Anselm, as St. Anselm had no duty to investigate Davis's certification that he was an accredited investor.  At the time the Notes were issued, St. Anselm was allowed to reasonably rely upon his representations in the Offering Documents.  Indeed, the reasonable belief of the issuer, and not the actual status of the purchaser, determines reliance.  *Tholen v. Ostler*, No. 2:07CV645DAK, 2008 WL 4446673, at *3 (D. Utah

Sept. 26, 2008) (unpublished) ("The applicability of the exception for sophisticated purchasers turns on the reasonable belief of the issuer, rather than the actual status of the purchaser."); *Anastasi v. Am. Petroleum, Inc.*, 579 F. Supp. 273, 275 (D. Colo. 1984) ("The [accredited investor] question turns on defendants' reasonable belief at the time of the transaction rather than the [plaintiffs'] actual financial condition and business sophistication.").

23. St. Anselm established procedures to exclude investors and potential investors that did not meet the required criteria.   (Doc. 226) at 120-23.   There was nothing in Davis's initial representation or in the Subscription Agreement that put St. Anselm on notice or to indicate that Davis was not an accredited investor. Therefore, Anselm had a reasonable belief that Davis was an accredited investor.  (*Id.*) at 182.

24. The present version of 17 C.F.R. § 230.506, which went into effect on September 23, 2013, includes a provision requiring that "[t]he issuer . . . take reasonable steps to verify that purchasers of [private] securities are accredited investors."  17 C.F.R. § 230.506(c)(2)(ii).  The regulation also lists "non-exclusive and non-mandatory methods of verifying that a natural person who purchases securities in such offering is an accredited investor; provided, however, that the issuer does not have knowledge that such person is not an accredited investor[.]"  *Id.*

25. The version of 17 C.F.R. § 230.506 in effect in 2008 and 2009, when Davis purchased the Notes, did not include a provision requiring the issuer to take steps to verify a potential investor's accredited status.   Indeed, these steps were not required of issuers until after April 2012, when enacted into law.  *See* Pub. L. No. 112-106, § 201(a)(1), 126 Stat. 306 (mandating that the SEC "revise its rules issued in [17 C.F.R. §] 230.506 . . . [to] require the issuer to take reasonable steps to verify that purchasers of the securities are accredited investors").

26. An examination of portions of the Congressional Record is helpful to understand what is now required and, by extension, what was not required in 2008 and 2009.  While considering enactment of the bill that was incorporated into Public Law 112-106, Representative Maloney stated,

> During the committee markup and work on this bill, we incorporated numerous ideas from both sides of the aisle, including a provision requiring that issuers verify that an investor is actually eligible to purchase the offered securities.  The Waters amendment made sure that the investors were credible and accredited. Today, as it stands, investors only self-certify that they have a million in assets or make $200,000 a year to qualify to purchase the private security.  Now, with this bill, we will have additional safeguards in places to make sure that investors are qualified and that these financial transactions are safer.

157 CONG. REC. H7291 (daily ed. Nov. 3, 2011) (statement of Rep. Maloney).

27. Similarly, Representative Lee stated at the same Congressional hearing:

> One of the more important provisions in the bill is to ensure the identities of investors.  The onus is on the issuer to verify that an investor actually is eligible to purchase the offered securities.  Currently, investors only self-certify that they have $1 million in assets or make $200,000 a year to qualify to purchase the private security.

157 CONG. REC. H7294 (daily ed. Nov. 3, 2011) (statement of Rep. Lee).

28. St. Anselm had no factual reason to question whether Davis was an accredited investor until August 17, 2010, when it received Davis's demand letter.  That is, St. Anselm did not have reason to know that Davis might not be an accredited investor when Davis purchased the Notes in 2008 and 2009.  Furthermore, given the history of 17 C.F.R. § 230.506, there was no legal duty for St. Anselm to verify the accreditation status of an investor beyond Davis's self-certification.  Davis has failed to demonstrate the first element of waiver—knowledge. Therefore, this Court concludes there was no waiver of the condition precedent that Davis be an accredited investor.

**IV. Applicability of Quasi-Contract**

29. Davis did not raise a quasi-contract claim prior to or at trial. Indeed, Davis acknowledged in his closing argument that "[q]uasi-[c]ontract is not applicable in this case," as there is an enforceable contract, one that "does not fail nor should . . . be rescinded." (Doc. 237) at 19. Nevertheless, this Court requested the parties brief the issue for consideration.

30. Quasi-contract is a "theory of contract recovery that invokes an implied contract when the parties either have no express contract or have abrogated it." *Dudding v. Norton Frickey & Assocs.*, 11 P.3d 441, 444 (Colo. 2000). Quasi-contract, also known as unjust enrichment or quantum meruit, "does not depend upon the existence of a contract, either express or implied in fact. Rather, it arises out of the need to avoid unjust enrichment to a party even in the absence of an actual agreement to pay for the services rendered." *Id.*

31. To recover in quasi-contract, "a plaintiff must demonstrate that: (1) at plaintiff's expense; (2) defendant received a benefit; (3) under circumstances that would make it unjust for defendant to retain the benefit without paying." *Id.* at 445 (citations omitted). "Whether injustice results often will turn on whether a party engaged in some type of wrongdoing." *Id.* (citation omitted).

32. Quasi-contract "is not a viable theory of recovery where there is an express contract governing the conduct." *Braddock Fin. Corp. v. Washington Mut. Bank*, 637 F. Supp.2d 924, 933 (D. Colo. 2009). However, "[u]nder some circumstances, a party to an unenforceable express contract may recover under" quasi-contract. *Dudding*, 11 P.3d at 445. This may occur when a contract fails. *Id.* A party may also recover under quasi-contract "when the implied-in-law contract covers conduct outside the express contract or matters arising subsequent to the express contract" or "when the party will have no right under an enforceable contract."

*Interbank Invs, LLC v. Eagle River Water & Sanitation Dist.*, 77 P.3d 814, 816 (Colo. App. 2003) (quotation and citation omitted).

33. Significantly, federal courts have no power to amend a complaint in situations such as this, even when there is evidence of unjust enrichment. *See, e.g.*, *Carpenters Health & Welfare Fund v. Bldg. Tech, Inc.*, 747 F. Supp. 288, 298 n.19 (E.D. Pa. 1990) ("During a trial conference at sidebar, the court went so far as to ask plaintiffs' counsel whether they wished to amend their pleadings in any way, and they declined.  We are now powerless to amend the complaint for them."); *see also In re Pinto*, 89 B.R. 486, 502 (Bankr. E.D. Pa. 1988) ("Debtors did not plead a cause upon unjust enrichment in their Complaint . . . [or] in their Trial Memorandum.  The Debtors could have sought to amend their pleadings . . . . [W]e cannot amend the Debtors' pleading *sua sponte*."); *Southern Constructors Group, Inc. v. Dynalectric Co.*, Civ. A. No. 90-2942, 1993 WL 17594, at *3 (E.D. La. Jan. 21, 1993) (finding plaintiff waived quasi-contract claim by failing to seek leave to amend complaint prior to decision by arbitration panel).

34. Davis never moved for leave to amend his complaint to include a quasi-contract claim. This Court declines to amend the complaint *sua sponte*.

35. Assuming *arguendo* Davis had amended his complaint to include a quasi-contract claim, this Court would conclude there is no evidence of any wrongdoing by St. Anselm.  *Dudding*, 11 P.3d at 445.  As previously noted, at the time Davis purchased the Notes, St. Anselm was under no obligation to verify Davis's accreditation status.  Therefore, the Court concludes that quasi-contract is inapplicable to this case.

## V.  Applicability of Judicial Estoppel

36. "Judicial estoppel is 'an equitable doctrine invoked by a court at its discretion.'"  *Kaiser v. Bowlen*, 455 F.3d 1197, 1203-04 (10th Cir. 2006) (quoting *New Hampshire v. Maine*, 532 U.S.

742, 750 (2001)).  The doctrine is "designed to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment."  *Id.* at 1203 (quotation omitted).

37. Courts consider the following factors in determining whether judicial estoppel applies:

> First, a party's later position must be clearly inconsistent with its earlier position.
> Moreover, the position to be estopped must generally be one of fact rather than of
> law or legal theory.  Second, whether the party has succeeded in persuading a
> court to accept the party's earlier position, so that judicial acceptance of an
> inconsistent position in a later proceeding would create the perception that either
> the first or the second court was misled.  The requirement that a previous court
> has accepted the prior inconsistent factual position ensures that judicial estoppel
> is applied in the narrowest of circumstances.  Third, whether the party seeking to
> assert an inconsistent position would derive an unfair advantage or impose an
> unfair detriment on the opposing party if not estopped.

*Id.* at 1204 (quotation omitted).

38. The Tenth Circuit applies the doctrine of judicial estoppel "both narrowly and cautiously."  *Vehicle Mkt. Research, Inc. v. Mitchell Int'l, Inc.*, 767 F.3d 987, 992-93 (10th Cir. 2014) (quotation omitted).

39. St. Anselm made assertions on March 2, 2011, in its Response to Plaintiff's Motion for Judgment on the Pleadings (Doc. 26) and in its September 29, 2011, Response to Plaintiff's Motion for Summary Judgment (Doc. 98) regarding Davis's investor status. The Court now concludes these assertions are not affirmative statements that Davis was not accredited.  Rather, the Court concludes they were opinions based on a reasonable belief at the time they were made.

40. At the time that St. Anselm submitted its proposed findings of fact in the District of Colorado SEC case on July 16, 2012, this Court had not yet ruled on Davis's motion for summary judgment and addressed whether Davis was an accredited investor.

41. As noted *infra*, 17 C.F.R. § 230.506 did not require in 2008 and 2009 St. Anselm to look beyond an investor's self-certification of accreditation.  Further, the registration exemption under

this regulation depended on the reasonable belief on the part of the issuer that the investor was accredited and not on the actual status of the investor.  *Tholen*, 2008 WL 4446673, at *3; *Anastasi*, 579 F. Supp. at 275.

42. Thomas Birge, St. Anselm's securities counsel, submitted the proposed findings of fact to the District of Colorado.  He testified at this trial that the statement that St. Anselm only issued securities to accredited investors focused on St. Anselm's belief at the time that the Notes were issued in 2008 and 2009. (Doc. 226) at 184.  Further, any preliminary evidence discovered in the present case regarding doubts as to Davis's status were "irrelevant" to the application of the term "accredited investor" in the SEC matter.  (Doc. 226) at 184.

43. St. Anselm had a reasonable belief, based on Davis's self-certification, that Davis was an accredited investor in 2008 and 2009.  Accordingly, St. Anselm's proposed findings of fact submitted to the District of Colorado are not "clearly inconsistent" with its argument before this Court that Davis may have misrepresented himself as an accredited investor.  Indeed, this latter argument required a bench trial and is only now being resolved.  St. Anselm's proposed findings of fact in the District of Colorado case and its argument at that time that Davis purportedly misrepresented himself as an accredited investor are not clearly inconsistent.  Therefore, judicial estoppel does not apply in this case.

## VI. Fraudulent or Negligent Misrepresentation of Accreditation Status

44. Defendants brought counterclaims for fraudulent misrepresentation and negligent misrepresentation of Davis's accreditation status.  (Doc. 164) at 15-17.  Defendants assert that they suffered damages in an amount to be proven at trial.  (*Id.*) at 16-17.  In their opening argument at trial, Defendants request that the Court find in their favor with regard to misrepresentation by Davis.  (Doc. 225) at 54.  At trial, witness and St. Anselm officer Michael

22

Zakroff stated that St. Anselm relied at the relevant times on an investor's self-certification of accreditation unless, as came forth in this case, St. Anselm "had some inkling or some suspicion that we might have been fraudulently induced."  (Doc. 226) at 112.

45. In order to establish the affirmative defense of fraud, Defendants must show that "(1) [Davis] made a false representation of a past or present fact; (2) that the fact was material; (3) that [Defendants] entered into the [Notes] relying on the assumption that the falsely stated fact was true; (4) that the reliance was justified; and (5) that the reliance caused damages." *Contrada, Inc. v. Parsley*, No. 10-CV-00646-WYD-CBS, 2012 WL 573918, at *4 (D. Colo. Feb. 22, 2012) (unpublished); *see* Colo. Jury Instr., Civil 30:18.

46. To establish negligent misrepresentation, the evidence must include the following: (1) Davis gave false information to St. Anselm; (2) Davis gave such information to St. Anselm in the course of a transaction in which Davis had a financial interest; (3) Davis gave the information to St. Anselm for the guidance or use of St. Anselm in a business transaction; (4) Davis was negligent in obtaining or communicating the information; (5) Davis gave the information with the intent or knowing that St. Anselm would act or decide not to act in reliance on the information; (6) St. Anselm relied on the information supplied by Davis; and (7) this reliance on the information supplied by Davis caused damage to St. Anselm.  Colo. Jury Instr., Civil 9:4; *see also Hildebrand v. New Vista Homes II, LLC*, 252 P.3d 1159, 1167 (Colo. App. 2010) ("To prevail on their claim for negligent misrepresentation, plaintiffs were required to prove that [defendant] supplied false information in a business transaction with them; that it failed to exercise reasonable care or competence in communicating that information; and that they justifiably relied on that false information.").

47. The Court finds that Defendants have failed to meet the first element of both fraudulent and negligent misrepresentation.  Defendants have failed to demonstrate with sufficient evidence that Davis made a false representation as to his net worth and accreditation status in the Offering Documents.  Accordingly, Defendants' claims for fraudulent and negligent representation fail.

## VII. Conclusion

48. This Court hereby concludes that Defendants are not liable to Davis for breach of contract; that being an accredited investor was a condition precedent to the Notes; that Davis failed to demonstrate that he was an accredited investor at the time of his purchase of the Notes in 2008 and 2009; and that waiver, quasi-contract, and judicial estoppel do not provide Davis with relief.  Further, this Court finds that Defendants have failed to show fraudulent or negligent misrepresentation by Davis of his accreditation status.

49. A Judgment consistent with these findings and conclusions shall be entered in favor of Defendants St. Anselm Exploration Company, Anna M.R.Wells, and Mark S. Palmer, and against Plaintiff Jimmie W. Davis, individually and as trustee of the Jimmie W. Davis Revocable Trust, in accordance with Federal Rule of Civil Procedure 52(a)(1).

_____
UNITED STATES DISTRICT JUDGE